# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT FLORIDA
### ORLANDO DIVISION

|  |  |
|---|---|
| **WENDY ROY, on Behalf of Herself and All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**PERDUE FARMS, INC.**<br><br>**Defendant.** | **Case No. 6:13-cv-1656-CEH-KRS**<br><br>**Honorable Charlene E. Honeywell**<br><br>**Magistrate Judge Karla R. Spaulding** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Wendy Roy ("Plaintiff"), by and through her counsel, files this Amended Complaint against Defendant, Perdue Farms, Inc. ("Perdue" or "Defendant"), and states as follows:

## NATURE OF THE ACTION

1.     This is a proposed class action against Perdue for misleading consumers about the purportedly "humane" treatment of chickens, the purported endorsement by the United States Department of Agriculture ("USDA") of the treatment of such chickens, and the unfounded distinction between the treatment of chickens eventually marketed and sold at retail under Perdue's "Harvestland" brand and the chicken of competitors, in violation of the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 through 501.213, Fla. Stat. and Florida common law.

2.      Looking to profit from growing consumer awareness of, and concern with, the treatment of farm animals raised for meat production, Perdue engaged in a deceptive and misleading marketing scheme to promote its fresh and frozen chicken as having been raised "humanely," as endorsed by the USDA, and as superior to the mass-produced chicken of its competitors.

3.      Starting in September 2009 and continuing to the present (the "Class Period"), Perdue has prominently packaged and labeled its Harvestland brand chicken products as "Humanely Raised," and has further indicated through its labeling that this "Humanely Raised" claim is "USDA Process Verified."

4.      These representations by Perdue are false and/or deceptive and misleading, and consumers do not receive their intended benefit of the bargain when they purchase premium-priced Harvestland brand chicken.

5.      Perdue's "Humanely Raised" and "USDA Process Verified" claims are based on the National Chicken Council's ("NCC") Animal Welfare Guidelines and Audit Checklist for Broilers ("NCC Guidelines").

6.      The NCC is an industry trade group that exists to promote and protect the interests of the chicken industry.  The NCC Guidelines essentially codify industry norms, are designed to maximize efficiency and profit, and do not ensure humane treatment. Indeed, chickens produced pursuant to those guidelines are systematically subjected to extreme pain and duress.

7.      In order to encourage low production costs, the NCC Guidelines endorse and justify a system of mechanized brutality that routinely inflicts intense duress and pain

2

on chickens, as discussed in more detail below.  These practices fall far below the level of treatment that Plaintiff and other reasonable consumers find "humane."

8.      The NCC Guidelines are followed by virtually every other mass chicken producer in the nation.  Unlike Perdue, however, no other mass chicken producer makes claims on their chicken packaging for the uniqueness of its chicken based on the company's adherence to the NCC Guidelines.  Only Perdue misrepresents to consumers that its chickens are raised differently, and more humanely, than competitors' chickens in this manner.

9.      Plaintiff and consumers were, and consumers continue to be, deceived by Perdue's marketing claims.

10.     Plaintiff now brings this suit to end Defendant's false, deceptive, and misleading practices and to recover the ill-gotten gains obtained by Defendant through this deception.  Plaintiff therefore seeks, on behalf of herself and the proposed Class members, declaratory and injunctive relief, compensatory damages, and an award of attorneys' fees and costs incurred in prosecuting this action.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the putative Class consists of at least 100 members, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Classes is a citizen of a different state than Defendant.

12.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this District.

## PARTIES

13.     Plaintiff Wendy Roy is a citizen of Florida and resides in Palm Bay, Brevard County, Florida.  On several occasions during the Class Period, Plaintiff Roy purchased Perdue's Harvestland products at BJ's in Melbourne, Florida and Malabar Organics in Malabar, Florida, based upon the label representations that the Harvestland chicken was "Humanely Raised," and that the chicken was specially endorsed by the USDA.

14.     For example, on dozens of occasions between 2010 and 2012, Plaintiff Roy purchased Harvestland chicken breasts and other Harvestland chicken products containing the "Humanely Raised," "USDA Process Verified" label at BJ's.  In addition, on numerous occasions, including January 16, 2011, February 11, 2011, April 29, 2011, May 22, 2011, and June 24, 2011, Plaintiff Roy purchased Harvestland boneless chicken breasts containing the "Humanely Raised," "USDA Process Verified" label at Malabar Organics.

15.     As discussed in more detail below, Plaintiff Roy relied upon these deceptive and misleading claims in making her decision repeatedly to purchase the Harvestland chicken, and her understanding of the meaning of the "Humanely Raised" and "USDA Process Verified" label claims was objectively reasonable.

16.     As discussed in more detail below, Plaintiff Roy suffered injury in that she would not have bought the premium-priced chicken labeled "Humanely Raised" had she known the truth that the chicken was not in fact treated humanely.

17.     Defendant Perdue, is incorporated in Maryland and in no other states. Perdue maintains its principal place of business located in Salisbury, Wicomico County, Maryland.  It is the fourth largest poultry company in the United States.

18.     Perdue's business, like most large producers in the industry, is vertically integrated, with Perdue controlling production of its chickens at each stage, including primary breeder operations, hatcheries, feed production and storage, growout operations, processing and cooking plants, transportation, and distribution centers.

19.     Perdue produces over half a billion chickens annually, and processes more than three billion pounds of chicken each year.

20.     Perdue's Harvestland brand chicken is available at retail stores throughout the Eastern United States, including in grocery stores throughout Florida.

21.     Perdue has approximately $4.6 billion in sales annually.

## SUBSTANTIVE ALLEGATIONS

22.     In recent years, consumers have become significantly more aware of and sensitive to the treatment of animals used in meat products, and to the negative environmental, social, and health impacts of industrialized chicken production in general.

23.     Because of high consumer demand for more "humane" meat products and a related increase in production costs, these products often command a premium price

while simultaneously taking away market share from similar products that do not make claims as to humane treatment.

24.     To garner a corner of the "humane" market for itself, in September 2009, Perdue began to market and sell chicken products under its Harvestland brand in packaging and with labels that prominently advertised that its chickens are "Humanely Raised" and "USDA Process Verified."   As discussed in more detail below, Perdue charged, and continues to charge, a premium price for Harvestland brand chicken it labeled as "Humanely Raised" and "USDA Process Verified."

25.     Perdue sells Harvestland chicken bearing the "Humanely Raised" and USDA Process Verified" labels throughout the State of Florida, including at large retailers such as BJ's Wholesale Club and Costco.

26.     As described more fully below, Perdue's "Humanely Raised" claim is false, deceptive, and misleading, and Perdue's "USDA Process Verified" claim is used by Perdue in ways that are deceptive and misleading.

**I.      Practices Which Necessarily Occur Under the NCC Guidelines and Perdue's "Best Practices"**

27.     The purported welfare standards upon which Perdue bases its "Humanely Raised" claim are nothing more than minimal standards developed by the industry itself – including Perdue executive Dr. Bruce Stewart Brown.   These standards, on their face, necessitate inhumane treatment and further allow essentially limitless noncompliance.

28.     Because Perdue's "Best Practices" are not materially different from the NCC Guidelines, Perdue's Harvestland chickens have been subjected to inhumane

handling in grow-out barns, on trucks, and by being shackled in ways that can break bones and dislocate joints.

29.     According to a report describing an audit that took place at Perdue's Perry, GA complex on January 9, 2012 through January 12, 2012 in connection with Perdue's "Humanely Raised" Process Verified Program, Perdue's program requirements relating to acceptable numbers of broken wings is materially indistinguishable from the NCC Guidelines.

30.     Because Perdue's "Best Practices" are not materially different from the NCC Guidelines, Perdue's Harvestland brand chickens are shackled by their legs, upside-down, while fully conscious as they are conveyed through processing facilities.  This treatment is contemplated by, and permitted under the NCC Guidelines.  Studies published in the peer reviewed journal *Neuroscience* suggest that upside-down leg shackling is painful for the chickens, and this pain is made worse by the fact that many meat chickens, or "broilers," suffer from abnormalities of the leg joints or bones. Moreover, hanging upside-down is a physiologically abnormal posture for chickens, and multiple studies, published in the peer reviewed journal *British Poultry Science*, have shown that inversion and shackling is traumatic and stressful.  These studies have also shown that approximately 90% of birds flap their wings vigorously when forced into this position, which can lead to broken bones and dislocated joints.

31.     Chicken labeled with the Perdue brand (as opposed to the Harvestland brand) formerly featured a "Humanely Raised" claim.  While that claim has been removed, Perdue facilities producing Perdue brand chicken are still audited according to

the same Process Verified Program "humane" standards as are facilities producing chicken sold under the Harvestland brand name."

32.     According to a report describing an audit that took place at Perdue's Milford, DE complex on May 10, 2010 in connection with Perdue's "Humanely Raised" Process Verified Program, Perdue's program requirements relating to electric stunning of birds prior to slaughter are materially indistinguishable from the NCC Guidelines.

33.     Because Perdue's "Best Practices" are not materially different from the NCC guidelines, Perdue's Harvestland chickens are electrically shocked before being effectively rendered unconscious, if they are at all, by such electric "stunning." Perdue's Harvestland brand chickens are electrically shocked in "stun baths," or vats of electrified water, which takes place after the birds have been shackled upside-down by their legs. This treatment, including the possibility that some percentage of birds will not be properly stunned, is contemplated by, and permitted under the NCC Guidelines. Scientific studies, including published peer reviewed articles in *The Veterinary Record* and the *Journal of Agricultural Engineering Research*, have shown that many birds experience painful electric shocks prior to being "stunned" due to wing-flapping at the entrance to the stunner. Moreover, studies published in journals such as *Poultry Science* have shown that the birds may experience electrically-induced paralysis, seizures, and cardiac arrest while still conscious.

34.     According to reports describing audits that took place at Perdue's Perry, GA complex on February 25 through March 1, 2013 and at Perdue's Milford, DE complex on May 10, 2010 in connection with Perdue's "Humanely Raised" Process

Verified Program, Perdue's program requirements relating to the neck-cutting of birds are materially indistinguishable from the NCC Guidelines.

35.     Because Perdue's "Best Practices" are not materially different from the NCC guidelines, at least some of Perdue's Harvestland chickens have had their necks ineffectively and partially cut while fully conscious because they were ineffectively stunned as described above and these birds have endured a semi-conscious, slow bleed to death.  The possibility that some percentage of birds will have their necks ineffectively cut is contemplated by, and permitted under the NCC Guidelines.

36.     Because Perdue's "Best Practices" are not materially different from the NCC guidelines, at least some of Perdue's Harvestland chickens have been drowned and scalded alive while conscious.   The possibility that some live birds will enter the "scald vat" is contemplated by the NCC Guidelines.  The chickens that Perdue raises are subject to conscious drowning in scalding water after the shackled birds have moved past the neck-cutting machines during processing.   Ineffective stunning and neck-cutting can allow the birds to regain consciousness while "bleeding out" and enter the "scald vat" while still alive.  According to industry magazine *WATT Poultry USA*, in some plants the rate of this occurring is as high as 3%.

37.     According to a report describing an audit that took place at Perdue's Rockingham, NC complex on September 13, 2010 through September 16, 2010 in connection with Perdue's "Humanely Raised" Process Verified Program, Perdue's program requirements relating to pre-slaughter holding of birds on transport trucks are materially indistinguishable from the NCC Guidelines.

38.     Because Perdue's "Best Practices" are not materially different from the NCC guidelines, Perdue's Harvestland chickens have been subjected to rough handling and crammed into stiflingly hot (or painfully cold) trucks for hours as they await slaughter, with no food or water.   The NCC Guidelines provide no minimum or maximum temperatures for which the chickens may be held on the trucks, and permit the holding of chickens on trucks for up to 15 hours.   The chickens that Perdue raises are subject to such conditions, which sometimes lead to the death of chickens before slaughter.

39.     According to a report describing an audit that took place at Perdue's Cromwell, KY complex on April 23, 2012 through April 26, 2012 in connection with Perdue's "Humanely Raised" Process Verified Program, Perdue's program requirements relating to the lighting schedule in growout sheds are materially indistinguishable from the NCC Guidelines.

40.     Because Perdue's "Best Practices" are not materially different from the NCC guidelines, Perdue's Harvestland chickens have been purposely deprived of natural resting behavior, encouraging abnormal growth.   The Harvestland brand chickens that Perdue raises are subject to continuous or near-continuous dim lighting in "growout" sheds, resulting in sleep deprivation.   This treatment is contemplated by, and expressly permitted under the NCC Guidelines.   Studies published in *British Poultry Science*, *Avian Diseases*, and *World's Poultry Science Journal* have found that an absence of sufficient periods of darkness per night precludes natural sleep and resting behavior of birds, exacerbates leg disorders, can cause sudden death syndrome, and increases mortality

levels.  Moreover, the NCC Guidelines do not require a minimum lighting intensity, and the dim, nearly continuous lighting may lead to abnormal eye development, causing uncomfortable and potentially painful eye disorders such as glaucoma and buphthalmia.

41.     Because Perdue's "Best Practices" are not materially different from the NCC Guidelines, Perdue's Harvestland chickens, as minutes-old chicks, have been thrown onto the floor by huge machines during mechanical separation from their shells, with many severely injured by the process.  The possibility of this happening is contemplated by, and permitted under the NCC Guidelines.  Industry advisor and welfare expert Dr. Temple Grandin has stated that this activity should constitute an automatic failure of any welfare audit, but it does not pursuant to the NCC Guidelines.

42.     Because Perdue's "Best Practices" are not materially different from the NCC Guidelines, at least some of Perdue's Harvestland chickens have suffered continuously from cardiovascular problems, painful bone deformities, ruptured tendons, and lameness throughout their short lives.  The Harvestland brand chickens that Perdue raises are plagued with chronic health problems because Perdue, like other major chicken producers, selectively breeds meat, or "broiler" chickens, for unnaturally fast growth. Emeritus professor John Webster of the University of Bristol School of Veterinary Science has stated that "[b]roilers are the only livestock that are in chronic pain for the last 20 per cent of their lives.  They don't move around, not because they are overstocked, but because it hurts their joints so much."  Perdue raises chickens that spend a full fifth of their short lives in chronic pain so severe that it effectively immobilizes them.  Perdue takes no steps to mitigate or remedy these health problems.

43.     Because Perdue's "Best Practices" are not materially different from the NCC Guidelines, and because, as described above, these chickens frequently suffer from painful bone deformities and leg problems, at least some of Perdue's Harvestland chickens have been unable to walk more than five feet at a time and have exhibited gait defects.  The chickens that Perdue raises are provided no veterinary care or relief even if they are unable to walk more than 5 feet or exhibit gait defects.  That some birds will exhibit gait defects and be unable to walk more than five feet at a time and not receive veterinary care is contemplated by, and permitted under, the NCC Guidelines.

44.     In short, the Harvestland chicken sold by Perdue was the product of an NCC-designed and supported production system that is, at its core, not humane, because the chickens were and are subject to one or more of the practices described above.

## II.     Harvestland "Humanely Raised," "USDA Process Verified" Chicken is Produced With the Same Processes Used Across the Mass-Produced Chicken Industry

45.     The NCC Guidelines are the basis for Perdue's "Humanely Raised" claim.

46.     Multiple sources indicate that Perdue's program is materially indistinguishable from the NCC guidelines:

47.     In a May 28, 2010 letter from Herbert D. Frerichs, Jr., General Counsel for Perdue, to Cathy Liss, President of the Animal Welfare Institute, Perdue's General Counsel stated: "The NCC Guidelines represent the *basis for humane care in raising poultry in a commercial setting* . . . In respect to Perdue, these NCC Guidelines were the *basis for our welfare program referred to as 'Humanely Raised.'*"  (Emphasis added).

The letter further stated that "Perdue's practices . . . are compliant with the [NCC's] Animal Welfare Guidelines."

48.     According to a document from the USDA's Agricultural Marketing Service ("AMS") entitled "Audit Section Weekly Activity," on December 17, 2008, AMS officials and Perdue representatives met to discuss Perdue's "Humanely Raised" claim.   The document stated that "Perdue's specific processes associated with the 'Humanely Raised' claim are based on the [NCC's] Animal Welfare Guidelines."

49.     On March 12, 2010, David Hermes, Regional Veterinary Services Manager at Perdue's Cromwell, KY complex (which processes Harvestland brand chicken) sent an email to Jack Boucher, Assistant National Supervisor of Audits for USDA AMS's Poultry Programs, explaining that Perdue was in the process of revising its "Humanely Raised" Process Verified Program ("PVP") manual to reflect recent changes in the NCC Guidelines.   The email stated that "[Perdue's] Humanely Raised PVP audit instrument contains the *same criteria as the NCC audit instrument . . . .*"   (Emphasis added).   Because the audit criteria for the Process Verified Program at Perdue are the same criteria used for NCC audits, there is no meaningful difference between the company's Humanely Raised PVP standards and the NCC standards.

50.     The audit checklist used by AMS personnel during audits of Perdue's hatcheries, grow-out farms, and slaughtering facilities is in all material respects identical to the audit checklist contained in the NCC Guidelines.   Specifically, the document states that it is the "NCC Animal Welfare Audit Checklist 16 April 2010 edition," and that it has been "Revised for USDA, AMS Process Verified Program Audits."   The document

further states that it has been "Revised only to remove point values from the checklist. No points are awarded." Apart from the revision to remove point values, the audit checklist is identical to the NCC's checklist, and all of the audit criteria are identical. As this document clearly illustrates, the audit criteria for Perdue's "Humanely Raised" PVP are the exact same criteria used during audits under the NCC Guidelines, and as such there is no meaningful difference between the company's Humanely Raised PVP standards and the NCC standards.

51. According to the NCC, it is "a full-service trade association that promotes and protects the interests of the chicken industry," NCC, Overview, http://www.nationalchickencouncil.org/about-ncc/overview/ (last visited Sept. 16, 2013), and "[a] substantial portion of NCC's budget is used to promote the consumption of chicken and to foster a positive public image for the chicken industry." NCC, Structure, http://www.nationalchickencouncil.org/about-ncc/structure/ (last visited Sept. 16, 2013). NCC member companies account for approximately ninety five percent (95%) of meat chickens produced in the United States. *Id.*

52. According to the "AMS Weekly Activity Report" for June 2, 2009, AMS reports that Dr. Bruce Stewart Brown, Perdue's own Senior Vice President for Food Safety and Quality, headed a small group of industry scientists and veterinarians who worked to develop recent revisions to the NCC Guidelines. The NCC Guidelines are not promulgated by a neutral third-party, and, expectedly, their primary purpose is to support the financial motivations of the chicken industry, including Perdue.

53.     The NCC Guidelines do nothing more than codify industry norms, which do not ensure humane treatment of chickens and which in fact systematically subject chickens to extreme pain and duress.

54.     In order to encourage low production costs, the NCC Guidelines authorize and justify a system of mechanized chicken production that routinely inflicts intense duress and pain.

55.     In order to encourage low production costs, the NCC Guidelines allow significant deviation and noncompliance with their already-meager animal treatment standards.   Indeed, the NCC Guidelines are riddled with huge loopholes for nonconformance.  A poultry producer can still claim to be "in conformity" with the NCC Guidelines even while failing to comply with numerous of their provisions.

56.     Moreover, while the audit checklist identifies certain occurrences as "major non-conformances," none of these occurrences result in the automatic failure of an audit: the checklist simply states in vague terms that the non-conformances must be "corrected" before the audit of that particular area can move on.   Major non-conformances include: live chicks in the trash at hatcheries; survival of chicks after euthanasia (i.e., live chicks suffocating in the trash); abuse of birds during catching and transportation; pre-slaughter caged holding times greater than 15 hours; live birds in the "Dead On Arrival" bins at the slaughter plant; and birds with uncut carotid arteries proceeding to the "scald vat" at the slaughter plant where they are submersed in scalding water while alive.  Since all that is required even during an NCC audit is "correction" of the problem, in day-to-day practice, when chicks are found crushed but alive in the trash,

or chickens are having their throats torn open by ineffective neck cutting machines while they are still conscious, these issues might be corrected temporarily, but there is nothing in the NCC Guidelines requiring systematic measures to prevent it from recurring every single day.  In other words, the "standards" themselves expressly allow for massive suffering for the several billion birds handled in conformity with them every year.

57.    The NCC Guidelines do not, in short, equal "humane" treatment, but are instead a codification of existing industry standards.  Such standards, as discussed below, are widely understood by consumers *not* to be humane.

58.    These uniform industry practices of systemized and routine cruelty expressly allowed for by the NCC Guidelines cannot justify a claim of "Humanely Raised," and indeed no mass chicken producer before has ever, without qualification, marketed its chicken as such.

59.    The NCC Guidelines are followed by almost every other mass chicken producer in the nation.  Tyson Foods, Inc. (ranked #1), Pilgrim's Pride (ranked #2), Sanderson Farms, Inc. (ranked #3), Koch Foods (ranked #5), and Peco Foods Inc. (ranked # 8) all expressly state on their respective websites that their company adheres to the NCC Guidelines.  Additionally, House of Raeford Farms, Inc. (ranked #9) has publicly stated that it adheres to the NCC Guidelines.

60.    The NCC's website states that the NCC Guidelines have been "widely adopted        within        the        chicken        industry."        *See* http://www.nationalchickencouncil.org/industry-issues/animal-welfare-for-broiler-chickens/ (last visited Sept. 16, 2013).

16

61.     Unlike Perdue, no other mass chicken producer makes claims on its packaging for the uniqueness of its chicken based on adherence to the NCC Guidelines. Perdue alone misrepresents to consumers that its chickens are raised "humanely," when this is in fact not the case.

62.     As might be expected, based on the toothless NCC Guidelines, Perdue exacerbates these already-low and cruel standards by violating those very standards. Indeed, a number of major non-conformances were found during USDA AMS audits, conducted for purposes of approval into the Process Verified Program, of various Perdue facilities, including facilities used to produce chicken products ultimately marketed as "Humanely Raised."   According to audit reports from USDA's AMS, these non-conformances include:

- large numbers of birds with broken wings at processing plants (at Perdue's Perry, GA slaughtering complex in early January, 2012, which produces both Harvestland and Perdue brand products, at Perdue's Rockingham, NC complex in December 2012, which produces Perdue brand products, at Perdue's Milford, DE complex in October 2012, which produces Perdue brand products, and again at Perdue's Dillon, SC complex on June 13, 2012, which produces Perdue brand products);

- live chicks in the hatchery waste stream (at Perdue's Milford, DE complex in late February, 2012, which produces Perdue brand products, and again at Perdue's Murfreesboro, NC hatchery on April 12, 2010, which produces Perdue brand products);

- excessive pre-slaughter holding times in trucks outside processing plants (at Perdue's Accomac, VA slaughtering complex on April 16, 2010, which produces Perdue brand products);

- improper stunning of birds as they proceed to the neck-cutting machines, which means birds may have been fully conscious when their throats were mechanically cut (at Perdue's Milford, DE slaughtering complex on April 19, 2010, which produces Perdue brand products);

- ineffective neck-cutting devices (at Perdue's Perry, GA complex in early January 2012 and again in late February 2013, which produces both Harvestland and Perdue brand products, at Perdue's Milford, DE complex in October 2012, which produces Perdue brand products, at Perdue's Lewiston, NC slaughtering complex on April 12, 2010, and again at Perdue's Milford, DE slaughtering complex on April 19, 2010, which both produce Perdue brand products); and

- excessive ammonia levels – nearly twice what the NCC Guidelines allow – in the growout sheds (at Perdue grow-out farms associated with its Cromwell, KY complex in late April 2012, on May 13, 2009, and again in December, 2009, which produce both Harvestland and Perdue brand products).

All of these "non-conformances" occurred during *pre-scheduled*, *announced* audits by AMS during the "Humanely Raised" Process Verified Program approval process – audits for which Perdue had advance notice and ample time to prepare.  Because each of the

above non-conformances occurred at Perdue plants under the same corporate oversight, organized in the same way, using the same industry-wide processes, the same industry-wide equipment, and following the same industry-wide NCC Guidelines, such non-conformances likely occur regularly at all Perdue plants, including those used to produce Harvestland branded products.

63.     More importantly, even if Perdue followed the NCC Guidelines perfectly and never failed to meet any requirement, every Harvestland brand chicken produced by Perdue would have been subjected to or derived from the cruel practices sanctioned by the NCC Guidelines, such as conscious, upside-down shackling, dipping in vats of electrified water, and sleep deprivation.  In addition, some portion of chickens are also subjected to further cruelty, based on disregard for the already-cruel NCC Guidelines.

64.     Plaintiff has no ability to witness Perdue's practices as described above because they all occur behind closed doors at properties the company owns or otherwise controls access to.  As such, Perdue has unique access to and control over the facts regarding day to day suffering of the birds it uses for its Harvestland chicken.

**III.     The "Humanely Raised" Label Claim Deceived Plaintiff**

65.     Plaintiff Roy believed that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and that they had a quick and painless death.  Plaintiff Roy would not have purchased the Harvestland chicken but for the "Humanely Raised" label.

66.     In January, 2012, at the request of plaintiffs in similar litigation in the District of New Jersey, Dr. Thomas Maronick, a Professor of Marketing at Towson

University, conducted an online survey of New Jersey consumers who buy fresh chicken to assess their perception of the "Humanely Raised" claim.  Dr. Maronick holds a Doctorate in Business Administration from the University of Kentucky and a Law Degree from the University of Baltimore School of Law.  Dr. Maronick is the former in-house marketing expert for the Bureau of Consumer Protection at the Federal Trade Commission (FTC).  Dr. Maronick has designed and implemented over 400 surveys for the FTC and for litigation clients.

67.     In the survey (hereafter "Maronick Survey"), 209 members of an online consumer panel who lived in New Jersey were shown a Harvestland chicken label.

68.     The survey results demonstrate that Plaintiff's interpretation of the label was objectively reasonable.  According to the Maronick Survey, the overwhelming majority of consumers believe that the manner in which Perdue treats its Harvestland brand chickens, as described above, is not consistent with its "Humanely Raised" claim.

69.     Plaintiff Roy believed that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have purchased the Harvestland chicken if she had known that the chickens were selectively bred for extremely fast growth, causing chronic health problems, including painful bone deformities.

70.     Plaintiff Roy's interpretation of the label was objectively reasonable.  According to the Maronick Survey, 80% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if the chickens were bred for extremely fast growth, causing the chickens to have chronic health problems.

71.     Plaintiff Roy believed that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have purchased the Harvestland chicken if she had known that the chickens were kept in barns and subjected to near continuous dim lighting, preventing natural rest and sleep behaviors.

72.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 84% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if a company kept its chickens in barns and subjected them to near continuous lighting, preventing natural rest and sleep behaviors.

73.     Plaintiff Roy believed that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have purchased the Harvestland chicken had she known that the company failed to provide veterinary care for chickens unable to walk more than five feet at a time, or exhibiting lameness or gait defects.

74.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 75% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if a company failed to provide veterinary care for chickens exhibiting lameness.

75.     Plaintiff Roy believed that that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life,  including that birds were handled and treated humanely when they were being transported to slaughter.

Plaintiff Roy would not have purchased the Harvestland chicken if she had known that this was not the case.

76.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 86% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if a company permitted the chickens to remain on transport trucks for long periods of time in extremely hot or cold temperatures.

77.     Therefore, reasonable consumers consider treatment during the transport of the chickens to slaughter to be covered by Perdue's "Humanely Raised" claim.

78.     Plaintiff Roy believed that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have purchased the Harvestland chicken if she had known that, prior to being slaughtered, the chickens had been shackled upside down while fully conscious.

79.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 81% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if, prior to being slaughtered, a company shackled the chickens upside down by their legs while the chickens were fully conscious.

80.     Therefore, reasonable consumers consider the shackling of conscious chickens prior to slaughter to be covered by Perdue's "Humanely Raised" claim.

81.     Plaintiff Roy believed that that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have

purchased the Harvestland chicken if she had known that, prior to being slaughtered, the shackled, fully conscious chickens would be dropped into a "bath" of electrified water.

82.    Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 81% of consumers surveyed would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if, prior to being slaughtered, a company shocked shackled chickens in vats of electrified water.

83.    Therefore, reasonable consumers consider electric bath stunning of chickens prior to slaughter to be covered by Perdue's "Humanely Raised" claim.

84.    Plaintiff Roy believed that that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have purchased the Harvestland chicken if she had known that, prior to being slaughtered, it was possible that the birds could be ineffectively "stunned" by the process involving the stun bath, and that some shackled birds could be conveyed to the neck-cutting blade that kills them while fully conscious.

85.    Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 66% of consumers would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if, prior to being slaughtered, chickens had their necks cut while fully conscious.

86.    Therefore, reasonable consumers consider neck-cutting at slaughter to be covered by Perdue's "Humanely Raised" claim.

87.    Plaintiff Roy believed that that the "Humanely Raised" label claim meant that Harvestland chickens were treated humanely throughout life, and would not have

purchased the Harvestland chicken if she had known that some birds could miss the cutting blade, or be ineffectively cut by the blade, and enter a vat of scalding water while alive, and conscious.

88.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 87% of consumers would either "definitely not" or "probably not" consider chickens to be "Humanely Raised" if the chickens were drowned in scalding water while conscious.

89.     Therefore, reasonable consumers consider the entering of chickens into "scald vats" during slaughter to be covered by Perdue's "Humanely Raised" claim.

90.     Plaintiff's interpretation that processes which occur directly prior to the death of the chickens at the slaughter plant were covered by Perdue's "Humanely Raised" claim is found in the fact that Perdue itself specifically included slaughter and its precursors in the definition of "Humanely Raised" when it based its claim on the NCC guidelines.  The Official Listing of Approved USDA Process Verified Programs, which lists and describes the scope and basis of claims verified by AMS under the PVP, makes clear that Perdue has specifically included "Processing" – industry terminology for the slaughtering process – within the scope of its "Humanely Raised" Process Verified Program.

91.     Further basis for the reasonableness of the Plaintiff's label interpretations which involve slaughter is found in the fact that the USDA audited each step of the slaughter process at plants producing Harvestland brand chicken when it evaluated Perdue's "Humanely Raised" claim for purposes of the Process Verified Program.

Moreover, Perdue admits that its Humanely Raised PVP claim audit criteria is "the same" as the NCC audit, which includes transport conditions and handling at slaughter facilities.

92.     Further basis for the reasonableness of the Plaintiff's label interpretations which involve slaughter is found in the fact that numerous other third-party "humane" certifications cover "slaughter" in their standards.  For example, the "Certified Humane" program, administered by Humane Farm Animal Care, the "American Humane Certified" program, administered by the American Humane Association, and the "Animal Welfare Approved" program, administered by the Animal Welfare Institute, all contain requirements for the treatment of broiler chickens during the slaughtering process that are more rigorous than the NCC Guidelines.

93.     Further basis for the reasonableness of the Plaintiff's label interpretations which involve slaughter is found in the fact that Perdue itself has previously argued for a broad definition of the term "raised."   In a 2009 lawsuit against Tyson Foods, Inc., challenging that company's "raised without antibiotics" claim, and in a petition to FSIS requesting the rescission of that marketing claim, Perdue argued to the court and to USDA that what happens *before* the bird is even hatched (that is, while it is *in ovo*) and placed on a farm for raising is encompassed in the term "raising."  *See* Second Amended Complaint, Dkt. No. 108, *Sanderson Farms, Inc., and Perdue Farms, Inc. v. Tyson Foods, Inc.*, Case No. RDB-08-CV-210 (D. Md. May 28, 2008).

**IV.     Perdue's Use of the "USDA Process Verified" Label Claim Deceived Plaintiff**

94.     Perdue's Harvestland labels prominently feature a shield that indicates that the "Humanely Raised" claim is "USDA Process Verified" immediately adjacent to the "Humanely Raised" claim.

95.     Plaintiff Roy believed that that the "USDA Process Verified" label claim, made in conjunction with the "Humanely Raised" claim, meant that Harvestland chickens were approved and endorsed as "Humanely Raised" by the USDA, acting as a neutral third party.  Plaintiff Roy would not have purchased the Harvestland chicken if she had known that this was not the case.

96.     Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 58% of consumers believe that the USDA Process Verified shield meant that the company meets standards for the treatment of chickens developed by the USDA itself.

97.      Investigation by counsel has revealed that the USDA Process Verified shield is not the product of a neutral evaluation of the treatment of Perdue's chickens based upon third party, government standards, but rather a marketing tool used in conjunction with the USDA Agricultural Marketing Service's ("AMS") Process Verified Program.  AMS is not a regulatory agency, but a marketing agency whose mission is to increase the sales of farmed products.

98.     Under the voluntary Process Verified Program, the specific "processes" to be "verified" (in this case the treatment of Perdue's chickens from hatchery through slaughter) are determined and defined by the company itself.

99.     Once AMS verifies, via desk and on-site audits, that the company is following its voluntary, self-defined processes, the company may use the Process Verified Shield in its marketing.

100.    In the context of Perdue's "Humanely Raised" claim, the Process Verified shield simply indicates that AMS has found that Perdue, like the majority of poultry producers in the country, has implemented a program based on the NCC Guidelines at its hatcheries, growout facilities, and slaughter plants. It does not mean AMS or any other service within USDA deems Defendant's conduct to be humane.

101.    Indeed, the USDA has specifically disclaimed any authority to define the term "humane" with respect to the treatment of poultry, from hatching until death, and there are no federal rules defining "humane" treatment of poultry.

**V.   Perdue Deceived Plaintiff and Consumers into Believing that Its Chicken Was Appreciably Different From, or Superior to, That of Its Competitors**

102.    Based on Perdue's "Humanely Raised" and "USDA Process Verified" labels (collectively "the labels"), Plaintiff Roy believed that Harvestland chicken was different and in material respects superior to standard mass produced industry chicken. Indeed, that is why she was willing to pay a premium price for Harvestland chicken.

103.    Plaintiff Roy's interpretation of the label was objectively reasonable. According to the Maronick Survey, 53% of consumers believe that the USDA endorses brands of chicken with the labels, 78% of consumers believe that brands of chicken with the label are "better than others on the market," and 52% of consumers believe that brands of chicken with the labels are higher quality than brands without.

104.   Perdue, in response to consumer research it conducted, removed a "Humanely Raised" labeling claim from its Perdue brand products after only a few months on the market.  A May 28, 2010 letter to Cathy Liss, President of the Animal Welfare Institute, from Herbert D. Frerichs, Jr., General Counsel for Perdue stated:

> Since the USDA Process Verified Program is new, Perdue recently completed extensive consumer research to validate the importance and clarity of the individual claims, including "humanely raised."  As a result of this research, Perdue has decided to revise the Perdue-branded label and will therefore be making changes to the consumer information it provides.  These changes to the Perdue-branded label are currently in process, and we trust the changes will alleviate AWI's concerns.

## VI.   Perdue Wronged Plaintiff and Consumers By Charging Premium Prices for Chicken that Was Handled in a Substantially Identical Manner to Standard Mass Produced Poultry Industry Chicken

105.   As discussed above, in all relevant respects Perdue treats its chickens in the same manner as other large chicken producers, as all use the NCC Guidelines.

106.   Because a consumer pays more for Harvestland products marketed as "Humanely Raised" and even though the birds that become such products are treated in all relevant respects identically to the vast majority of other chicken products which lack a "humane" label, Perdue perpetrates a fraud on its consumers.

107.   Plaintiff and other consumers paid premium prices for Harvestland chicken.

108.   According to pricing data compiled by the USDA's AMS, Harvestland brand chicken was, for the most part, more expensive than comparable brands of mass-produced chicken in Florida grocery stores in 2010.

109.    Plaintiff and other consumers would not have purchased Harvestland chicken at premium prices, but for the false and misleading humane marketing claims made by Perdue.

110.    Plaintiff and other consumers have been damaged in the amount of the difference between the price of Harvestland chicken and the actual retail value of standard, mass-produced chicken not marketed as "Humanely Raised."

111.    In August 2013, representatives for Plaintiff's counsel surveyed grocery stores in Florida that carried Harvestland brand chicken products.  Plaintiff compared the price per pound of Harvestland brand chicken cuts against corresponding cuts of chicken from other brands found in the same aisle of the same store, on the same date.  For each comparison, the percent difference was calculated, and then the average percent difference of all of the comparisons was calculated.

112.    In almost every instance, Harvestland was more expensive than the other brands – which (with the exception of the generic brand) also contained labeling claims such as "all vegetarian diets," "no animal by-products," "no hormones and steroids added," "100% natural," "no artificial ingredients," and "minimally processed."  Each of the Perdue brand chicken products, which, in almost every instance cost considerably less than the Harvestland brand chicken products, also carried the "Process Verified" shield and claims of "vegetarian fed," and "no animal by-products."  Unlike the Harvestland brand products, however, none of these other brands made "humane" claims on their labels.

113.    Plaintiff's price research indicates that, on average, in Florida, Harvestland chicken sells for a premium of approximately 76% per pound over other brands of mass-produced chicken products that are not marketed as "Humanely Raised."

## CLASS ALLEGATIONS

114.    Plaintiff brings this lawsuit on behalf of herself and the proposed class members under Fed. R. Civ. P. 23(a) and (b).  The proposed Class consists of:

> All persons who purchased any Harvestland product labeled "Humanely Raised" and/or "USDA Process Verified" during the period September 2009 to present in the State of Florida (the "Class").

115.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

116.    Specifically excluded from the Class are officers and directors of the Defendant, members of the immediate families of the officers and directors of the Defendant, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.

117.    At this time, Plaintiff does not know the exact number of Class members; however, given the immense sales volume of Harvestland chicken products, Plaintiff believes that Class members are so numerous that joinder of all members of the Class is impracticable.

118.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the

Class which predominate over questions which may affect individual Class members include:

(a)     Whether Perdue labeled, marketed, advertised and/or sold its Harvestland chicken products to Plaintiff and those similarly situated using false, misleading and/or deceptive statements or representations, including statements or representations concerning the humane treatment of animals used in the production of such products; the purported endorsement by the USDA of  products derived from such chickens; and the unfounded distinction between chicken products marketed and sold at retail under the "Harvestland" brand and the chicken of competitors;

(b)     Whether Perdue misrepresented material facts in connection with the sales of its chicken products;

(c)     Whether Perdue participated in and pursued the common course of conduct complained of herein;

(d)     Whether Perdue's marketing, labeling, and/or selling of its Harvestland and Perdue products as "Humanely Raised" and  "USDA Process Verified" constitutes a deceptive act or practice in the conduct of business, trade, or commerce in Florida; and

(e)     Whether Perdue breached an express warranty.

119.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased a Harvestland product bearing the "Humanely Raised" and "USDA Process Verified" packaging or label in a typical consumer setting and sustained damages from Defendant's wrongful conduct.

120.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions.  Plaintiff has no interests that conflict with those of the Class.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

122.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

123.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

124.    Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, inter alia, equitable remedies with respect to the Class as a whole.  As such, Defendant's systematic policies and practices make injunctive and declaratory relief with respect to the Class as a whole appropriate.

### COUNT I
**(Violation of the Florida Deceptive and Unfair Trade Practices Act
§§ 501.201 through 501.213, Fla. Stat.)**

125.    Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

126.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  § 501.204, Fla. Stat.

127.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  § 501.202, Fla. Stat.

128.    Perdue, at all relevant times, solicited, advertised, offered, provided and distributed goods in the State of Florida, and thereby was engaged in trade or commerce as defined by § 501.203(8), Fla. Stat.

129.    Plaintiff at all material times was a consumer as defined by § 501.203(7), Fla. Stat., and is entitled to seek the underlying relief.

130.    Perdue's marketing of its chicken products as "Humanely Raised" and "USDA Process Verified" constitutes a deceptive act in violation of FDUTPA.

131.    As set forth above, the packaging and labeling of Perdue's chicken products as "Humanely Raised" is false, deceptive and misleading because they cause consumers to believe that Perdue's products are different from those of its competitors in that the animals it uses are treated humanely throughout their entire lives.

132.    Perdue's "Humanely Raised" chickens are not treated humanely or differently from Perdue's other chickens, and are not treated in any material respects differently from chickens of other major producers.

133.    As set forth above, the packaging and labeling of Perdue's chicken products as "USDA Process Verified," in conjunction with the "Humanely Raised" labeling claim, is false, deceptive and misleading because it causes consumers to believe that the manner in which Perdue treats its chickens is independently evaluated and approved by the USDA.

134.    Perdue's "Humanely Raised" chickens are not so endorsed or verified by the USDA.

135.    Perdue designed the false, deceptive, and misleading packaging and labeling with intent to sell, distribute and increase the consumption of its Harvestland brand products.

136.    Defendant's violation of the FDUTPA caused Plaintiff and putative Class members to suffer ascertainable losses. Specifically, Perdue's false, deceptive and misleading packaging, labeling, and advertising caused consumers to purchase, and pay a premium for, Perdue's products believing they were "Humanely Raised" and "USDA Process Verified" when, in fact, they were not and are not treated differently from Perdue's other chickens or differently in any material respects from chickens of other major producers.

137.    Pursuant to § 501.211(2), Fla. Stat., Plaintiff is authorized to bring a civil action to recover Plaintiff's actual damages, plus attorneys' fees and court costs, as provided by § 501.2105(1)(3), Fla. Stat.

## COUNT II
### (Fraud in the Inducement)

138.    Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

139.    Perdue has marketed and sold chicken products under its Harvestland brand with packaging and labeling prominently displaying claims that the chickens were "Humanely Raised" and that such treatment was evaluated and approved by the USDA. These claims are false and were known to be false when made, and constitute fraud.

140.    The elements of common law fraud include the following: 1) Defendant made a material misrepresentation of a presently existing or past fact; 2) Defendant made the misrepresentation with knowledge or belief that it was false; 3) Defendant made the misrepresentation with the intent that the plaintiff rely upon the fact; 4) Plaintiff reasonably relied on the fact; and 5) as a result of the reliance, Plaintiff suffered damages.

141.    Perdue represented, marketed, and sold its chicken products as "Humanely Raised" when, in fact, they were not.  Perdue knew its "Humanely Raised" claim to be false regarding the products it so labeled.  Perdue knew or had reason to know that a growing number of consumers are concerned with the treatment of animals raised for food and are willing to pay a premium for food products they perceive to be humane, and/or verified by a third party to be humane.

142.    Perdue knew or believed that Plaintiff and reasonable consumers would not consider the manner in which its chickens are raised and slaughtered to be "humane." Perdue was fully aware of the practices by which it raises and slaughters its chickens, and knew that these practices were no different than those of other major chicken producers

in the United States or different from how Perdue handled its other chickens. Perdue knew that reasonable consumers, concerned with the manner in which farm animals are often treated by large producers, seek out products distinguished as "humane" because they consider those products to be different than, and preferable to, products without that distinction.

143.    Perdue intended that consumers rely on the claim that its chickens were "Humanely Raised" and/or "USDA Process Verified" and that such claim would induce consumers to buy their products for a premium price. Perdue deliberately led consumers, including Plaintiff and the putative Class, to believe falsely that the products they were purchasing were raised "humanely" and therefore differently, than competitors' products or their own other products.

144.    Plaintiff and the putative Class relied on Perdue's claims that its chickens were "Humanely Raised." Plaintiff's and the putative Class' reliance was reasonable on its face, particularly given the appearance and labeling of the products, including the presence of the USDA Process Verified Shield.

145.    Perdue's fraudulent conduct damaged Plaintiff and the putative Class in the amount of the difference between the price of Harvestland chicken and the actual retail value of standard, mass-produced chicken not marketed as "Humanely Raised." Plaintiff and the putative Class suffered damages because they were deceived into buying and paying a premium for chicken products that they believed to be humanely raised, and therefore different from the majority of similar products on the market, when in fact they

were not. Neither Plaintiff nor any putative Class member would have purchased Perdue's products at a premium price had they known the truth.

## COUNT III
### (Negligent Misrepresentation)

146. Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

147. Perdue represented, marketed, and sold its chicken products as "Humanely Raised" and/or "USDA Process Verified." If not deliberately fraudulent, and in the alternative to that theory, these claims constitute negligent misrepresentations.

148. Perdue made the false or deceptive claims without reasonable grounds for believing them to be true.

149. Plaintiff and the Class relied on Perdue's misrepresentations of fact when they purchased Perdue's chicken products. Plaintiff' and the putative Class' reliance was reasonable on its face, particularly given the appearance and labeling of the products, including the presence of the USDA Process Verified Shield.

150. Plaintiff and the putative Class suffered damages in the amount of the difference between the price of Harvestland chicken and the actual retail value of standard, mass-produced chicken not marketed as "Humanely Raised." Plaintiff and the putative Class suffered damages because they were deceived into buying and paying a premium for chicken products that they believed to be humanely raised and/or verified and approved as humanely raised by the USDA, when in fact they were not. Neither Plaintiff nor any putative Class member would have purchased Perdue's products at a premium price had they known the truth.

## COUNT IV
### (Breach of Express Warranty)

151.     Plaintiff repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

152.     Plaintiff, and each member of the Class, formed a contract with Perdue at the time Plaintiff and the other members of the putative Class purchased Harvestland chicken products with a "Humanely Raised" and/or "USDA Process Verified" label.  The terms of that contract include the promises and affirmation of fact made by Perdue on its product labels.  This product labeling constitutes express warranties, became part of the basis of the bargain, and is part of a standardized contact between Plaintiff and the members of the putative Class on the one hand, and Perdue on the other.

153.     All conditions precedent to Perdue's liability under this contract have been performed by Plaintiff and the Class.

154.     Perdue breached the terms of this contract, including the express warranties, with Plaintiff and the putative Class by not providing the product as described on the labeling.

155.     As a result of Perdue's breach of its contract and warranties, Plaintiff and the putative Class have been damaged in the amount of the difference between the price of Harvestland chicken and the actual retail value of standard, mass-produced chicken not marketed as "Humanely Raised."

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment against the Defendant, PERDUE FARMS, INC., as follows:

1.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 of a class of all persons who purchased Harvestland products packaged, labeled, or advertised as "Humanely Raised" and/or "USDA Process Verified" during the putative Class Period and appointing Plaintiff as class representative for the Class and their counsel as Class Counsel;

2.     Enjoining Defendant from pursuing the acts and practices complained of herein;

3.     Declaring that Defendant's marketing of its products as "Humanely Raised" and/or "USDA Process Verified" is fraudulent, deceptive, and/or misleading, or declaring that such marketing breaches an express warranty;

4.     Ordering Defendant to pay restitution to Plaintiff and members of the Class an amount that is the equivalent to the amount acquired by means of any unfair, deceptive, fraudulent, unconscionable, or negligent act employed by Defendant as referenced in this Complaint, or any other amount authorized by statute;

5.     Ordering Defendant to disgorge any ill-gotten benefits received from Plaintiff and members of the Class as a result of Defendant's false, deceptive or misleading packaging, labeling, and advertising of its "Humanely Raised" and/or "USDA Process Verified" products or as a result of Perdue's negligent misrepresentation of its products as "Humanely Raised" and/or "USDA Process Verified";

6.     Awarding reasonable costs and attorneys' fees;

7.     Awarding applicable pre-judgment or post-judgment interest; and

8.      Awarding such other and further relief as the Court may deem necessary or appropriate.

Dated: November 12, 2013.

Respectfully submitted,

**KOPELOWITZ OSTROW P.A.**

By: _/s/ Jason H. Alperstein_
        Jeffrey M. Ostrow
        Fla. Bar No. 121452
        ostrow@kolawyers.com
        Jason H. Alperstein
        Fla. Bar No. 064205
        alperstein@kolawyers.com
        200 S.W. 1st Avenue, 12th Floor
        Fort Lauderdale, FL 33301
        Telephone: (954) 525-4100
        Facsimile: (954) 525-4300

        _Co-Counsel for Plaintiff and the Proposed Class_

        Jonathan K. Tycko (_pro hac vice to be filed_)
        jtycko@tzlegal.com
        Jeffrey D. Kaliel (_pro hac vice to be filed_)
        jkaliel@tzlegal.com
        **TYCKO & ZAVAREEI LLP**
        2000 L Street, N.W.
        Suite 808
        Washington, D.C. 20036
        Telephone: (202) 973-0900
        Facsimile: (202) 973-0950

        _Co-Counsel for Plaintiff and the Proposed Class_

Jonathan R. Lovvorn (*pro hac vice to be filed*)
jlovvorn@hunanesociety.org
Rebecca A. Cary (*pro hac vice to be filed*)
rcary@humanesociety.org
**THE HUMANE SOCIETY OF THE UNITED STATES**
2100 L St. NW
Washington, DC, 20037
Telephone: (202) 676-2330
Facsimile: (202) 676-2357

*Co-Counsel for Plaintiff and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 12, 2013, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system, which will cause a true and correct copy to be served via e-mail on all ECF-registered counsel of record.

<u>*/s/ Jason H. Alperstein*</u>
Jason H. Alperstein